# Exhibit 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

SCOTT HARGIS d/b/a SCOTT HARGIS PHOTO,

Plaintiff,

vs.

Case No. 8:22-cv-01476-TPB-TGW
Honorable Thomas Barber
Mag. Judge Thomas Wilson

AMERICAN HOUSE SENIOR,

LIVING LLC and DOES 1 through 10,

Defendants.

______________________________/

CONFIDENTIAL

VIDEO DEPOSITION OF SCOTT HARGIS

APPEARING REMOTELY

Wednesday, February 22, 2023

1:06 p.m. EST

REPORTED BY:

Cheri L. Poplin, CSR-5132, RPR, CRR

APPEARING REMOTELY FROM WAYNE COUNTY, MICHIGAN

to another city.
Q. Okay. In this Exhibit 1, do you see -- and throughout the exhibits, if it's an email, I'd ask you to probably start at the bottom because, as you might guess, they read in reverse chronological order.
A. Right.
Q. Who is Danielle Armstrong?
A. Danielle Armstrong was in the marketing department with Atria Senior Living.
Q. Did you know her prior to May 8, 2018?
A. Yes, I did.
Q. How did you know her?
A. Professionally. She frequently engaged me for photography.
Q. What year did you meet Ms. Armstrong?
A. We may have met in person prior to that email, but I'm not really sure. As far as when my first ever email contact with her is I don't know.
Q. Had you worked with her professionally before May 8, 2018?
A. Yes. When I said that she frequently engaged me as a photographer, that's what I was referring to.
Q. How many occasions had she engaged you before May 8, 2018?
A. I do not remember.

Q. Was it more than ten as far as you recall?
A. Sure. That's accurate.
Q. Okay. As of May 2018 do you know about how much in gross total you had charged for a photographer for you had done where Danielle had engaged you?
A. I don't.
Q. Do you know if it's more than a million dollars?
A. I don't think it would be more than a million, no.
Q. I'm sorry. You say you do not believe it would be more than a million?
A. It would not be more than a million.
Q. Do you think it would be greater than $500,000?
A. No.
Q. Okay. What other companies has Ms. Armstrong worked for when she hired you?
A. I don't know.
Q. Do you -- did you ever work with her other than when she was employed by Atria Senior Living?
A. No.
Q. Okay. So you had done a number of jobs for Atria Senior Living prior to May 2018; is that correct?
A. That's correct.
Q. What do you recall about this -- the phone call that is referenced in this exhibit?
A. I recall the phone call. I was out of town. We

scheduled a time based on our time zones. She outlined the project that she wanted to discuss. We quickly went over what the parameters would be. It was actually routine work that we had both done together many times. The only unusual part was that they were committing to a relatively large number en masse as it were. Normally they're one, two, three at a time, you know, assignments. We have four locations we'd like you to shoot, Scott. That sort of thing. This was an unusually large number to be committing to in one go. And so that was the bulk of our conversation was what -- what's that about.

Q. Prior to this May 2018 call, do you know during which years you had done work for Atria Senior Living?

A. Every year beginning in 2011.

Q. Was it typically one time a year or two times a year? Can you just give me any sense of how frequent the engagement were -- engagements were year to year?

A. It varied. I don't think there were any years where it was one. So let's say four to 20. It was really variable.

Q. As far as you recall, were they, as you I think suggested, generally one facility assignment at a time?

A. That's a hard one. Maybe -- yes. There were -- there

were definitely many instances where I would receive an email or a phone call saying we have one community in a city that we'd like you to shoot. It is also common to say we have two in Denver, we have two in Denver and one in Kansas City. So they were just typically -- they were treated as individuals even if they might be coming up rough -- roughly at the same time.
Q. Understood. Between 2011 and 2018 were the Atria facilities you had photographed all over the country or were they more centrally located in one or two regions?
A. Well, they were all over the country within the -- within the -- Atria is not all over the country. Right? So they were everywhere that -- that Atria operates and including Canada.
Q. Best you can off the top of your head, what are the provinces and states in which you've photographed Atria facilities?
A. This may not be a -- a completely accurate list. I may not remember every location. So with that caveat, California certainly, Arizona. I'm trying to work my way westward. Colorado. I'm not sure about New Mexico. Texas, yes. Florida, Virginia, Illinois, Michigan, New York. I couldn't -- yeah. And British

A. I don't know exactly. It would be in that ballpark, but the actual amount undoubtedly varied from that.
Q. Okay. Let me just estimate. For this one job do you believe you were paid somewhere between 115,000 and 130,000?
A. That dollar range sounds accurate. The characterization of this as one job is problematic because of the nature of the work. We invoiced each one separately. They are all individual entities. Just to be accurate.
Q. In your view, could you perform this contract if you did not photograph each of the 25 facilities?
MR. TEHRANIAN: Objection to the extent that it calls for a legal conclusion.
But you can answer.
A. I don't think I understand it. What -- what are you --
BY MR. LANNEN:
Q. Sure. And I'm just asking for your view. That's why I said in your view. My question is, in your view could you photograph any less than 25 facilities and be paid as part of this job?
MR. TEHRANIAN: Objection. Same objection. Calls for a legal conclusion.
But you can answer.

A. That's correct.
Q. Okay. And stylist --
A. Actually I need to -- I need to back up on that. I'm sorry. This is five years ago, and I know --
Q. No. I understand.
A. -- this is something that I should have top of mind because we're having a proceeding that's about it and I ought to know this. But the fact is I don't remember some of the details. I did not pay the stylist's day rate directly.
Q. Did it come out of the gross total you were paid, however?
A. That's -- give me a minute to think. Yeah. That is correct. Atria paid -- Atria wrote -- well, I don't know if they wrote checks. They paid for JD's day rate directly. I deducted that amount on each location, out of my fee for each location.
Q. Understood.
A. I think that's an important distinction.
Q. Sure. Well, I don't know if it is or isn't important. But I recognize that the costs of the stylist were deducted from the gross total you were paid; correct?
A. To the best of my memory, yes. I'm really interested to look into that now.
Q. No problem. And the gross total you were paid between

115,000 and 130,000 we estimate also included your post production expenses; correct?
A. That's correct.
Q. And it also included high resolution delivery; correct?
A. That's correct.
Q. And just for my own edification, is high resolution delivery a service you perform in connection with some software that you own?
A. High resolution delivery means electronic transfer of a file from me to my client's inbox.
Q. And how does that image gain its high resolution property features?
A. High resolution to me refers to the pixel count of the digital file.
Q. And that pixel count is a function of the characteristics of the actual photography equipment you're using when actually performing the photograph taken; correct?
A. That's correct.
Q. Thank you.
MR. LANNEN: I just need to use the restroom. We've been going a little over an hour anyway. I try and take a break about once an hour. So want to just come back in about five minutes or so?

BY MR. LANNEN:
Q. Are you aware of any copyright claims against Atria Senior Living?
A. No, I'm not.
Q. Did you group the photos you took for the summer 2018 Atria job by facility?
MR. TEHRANIAN: Objection. Vague and ambiguous as to what group the photos means.
Scott, you can answer if you understand.
A. Actually I agree. I don't understand the question.
BY MR. LANNEN:
Q. Okay. You created separate invoices for each photo; correct?
A. No.
Q. I'm sorry. You created separate invoices for each facility; correct?
A. Atria requested to be invoiced indivi -- yes. So Atria requested that I invoice them with a separate invoice for each facility.
Q. Did you do that?
A. Yes, I did.
Q. So what exactly is the other copyright case you were referring to about in your own words?
A. It was unauthorized use of copyrighted photos that I own by an unauthorized party.

should be yes. I don't have a -- I don't remember the invoice specifically, but that was the -- that was Atria's standard request was to have each community invoiced individually.

BY MR. LANNEN:

Q. As far as you can recall, did you invoice every facility individually when taking photos for Atria?

A. Yes.

Q. That includes Sarasota, Florida?

A. You broke up. Did you ask if that included Sarasota, Florida?

Q. Yes.

A. Yes. I invoiced Sarasota, Florida, separately.

Q. Same for Orange City, Florida?

A. Same for Orange City, Florida.

Q. And the same for Lutz, Florida; correct?

A. Yes. Those three for sure.

Q. Have you asserted any copyright claims aside from the ones in this case pertaining to Florida and the ones in Exhibit 3 pertaining to California?

MR. TEHRANIAN: Objection. Vague and ambiguous as to asserted copyright claims.

But you can answer the question, Scott, if you understand it.

A. I actually would ask for clarification on that.

a half day travel to get there, a day to conduct the photo shoot, and another half day travel to return. Does that make sense?
Q. Yes. Absolutely. But --
A. Okay.
Q. -- I guess my question --
A. In a situation -- yeah, yeah. I'm getting there. As I recall, we shot two locations, Sarasota and Lutz, on the same trip, so we -- we traveled to the Tampa area, but we photographed -- actually there may have been more, multiple locations, and then returned, so the number of -- so the shoot day -- how do I explain this? We only billed one of his travel days in some cases but two travel days in other cases. There's no other way to do it. Because Atria wanted each location to have its own invoice, you have to decide where you're going to allocate these travel days. Does that make sense?
Q. Yes.
A. The difference -- the difference in the rate reflects somewhere a true-up on this half day of travel. It doesn't necessarily apply to every shoot. I don't know if that's clear, but . . .
Q. No. It's fine. I just want to be clear. But you weren't paid a day rate. You were paid a flat fee for

the entire summer 2018 job of all 25 facilities; correct?

A. That is not correct. I was paid a licensing fee for each location.

Q. Okay.

A. And we estimated up front that there would be a certain number of locations and somebody did that math, but it's the reality that I invoiced for and it's on a per location basis.

Q. Right. And that's why the grand total ends up being somewhere between about 115,000 and 130,000 we estimate; correct?

A. The estimate of the locations back in May when the first -- when the shoot was being discussed was everyone's best good faith, like we think this is what we're going to shoot, but over the course of the next few months, again, there were scheduling conflicts for some locations that I think someone else probably photographed and other locations that were added in, and it should be mentioned that Atria had other shoots that were not part of that particular project that were also conducted that year.

Q. And it turns out that the estimate of 125,000 in total for all proposed 25 facilities ended up being pretty close to accurate; correct?

MR. TEHRANIAN: Objection. Vague and ambiguous as to what sale we're referring to.
BY MR. LANNEN:
Q. Do you see Exhibit 4, Mr. Hargis?
A. Yes. The invoice.
Q. Yes. And you were paid under that invoice; right?
A. Yes.
Q. And I'm just asking do you know what your expenses were to travel to Lutz and take those eight photographs?
A. No, I don't.
Q. Okay. And I have the same question for Exhibit 5 on Sarasota. You were paid the $4,287.50; correct?
A. Yes.
Q. And do you know what your expenses were in traveling to Sarasota and taking those photographs?
A. No, I don't.
Q. Same for Exhibit 6. Do you -- you were paid the $4,287.50 for licensing the Orange City photographs; correct?
A. Yes.
Q. Do you know what your expenses were in that trip?
A. No.
Q. If you go to Exhibit 9. I'm going to ask you to scroll down to Pages 13 to the end -- 13 to 23. Do

brought?

MR. TEHRANIAN: Objection to the extent it calls for speculation.

Again, Scott, you can answer if you have personal knowledge.

A. I don't really understand the question, but I don't -- I don't -- you're asking me like what is -- what -- what chain of events may have led to an infringement? I don't -- I don't know. I have no way of knowing why people do what they do.

BY MR. LANNEN:

Q. Okay. I don't think that was my question at all, but . . . I'll ask a few other ones. We'll come back to it.

What is the market value of the Lutz pictures at Exhibit 4?

A. Market value depends on the market -- the photograph itself -- how do I answer this? The value of a photo lies in its usage. So, for example, if a photograph is going to be used one time, the size of a postage stamp, on an internal document, that's a small value relatively to, for example, the front cover of the New York Times or a ad campaign run globally on bus stations and billboards, et cetera. So the value is not intrinsic to the photo. It's the usage of the

photo.
Q. What dollar amount is the market value of the eight images listed in Exhibit 4?
MR. TEHRANIAN: Objection. Asked and answered.
Scott, you can answer.
A. It's -- it's an unanswerable question.
BY MR. LANNEN:
Q. There's no dollar amount --
A. It's like asking -- you're asking how long is a piece of string.
Q. Okay. I'm saying do you have any number that you believe those eight images in Exhibit 4 are worth?
MR. TEHRANIAN: Objection. Asked and answered.
A. I agree. It's an unanswerable question.
BY MR. LANNEN:
Q. What is the market value of the license to use the eight images identified in Exhibit 4?
MR. TEHRANIAN: Again, objection. Asked and answered.
BY MR. LANNEN:
Q. Go ahead, Mr. Hargis.
A. I don't know. That's an un -- I can't -- that is not a question that can be answered.

Q. Have you licensed the eight images in Exhibit 4 to anyone other than Atria?
A. No. Exhibit 4. Well, no.
Q. Are you able to give a market value for the license of the nine images in Exhibit 5 for Sarasota?
A. The answer is no to the extent that the question as asked is not an answerable question.
Q. Well, we can ask it any number of ways. My question, however you want me to phrase it I'll do so, is is there any way you could give your opinion on the market value of a license to use the nine images in Exhibit 5 for Sarasota?
A. You would need to be specific about the terms of the license.
Q. Okay. We'll go back to Exhibit 4. What is the market value of the exact license given in Exhibit 4?
A. Okay. You want to -- Exhibit 4 is the license that I granted to Atria and Ventas for the Lutz location; right?
Q. Yes.
A. Okay. Well, at that time it was $4,525.
Q. Would it be different today?
A. Absolutely.
Q. How do you figure?
A. My rates have increased.

Q. Okay.
A. Photography has increa -- inflation has happened, and then there are factors including the value to the potential licensee.
Q. So what would the number be today?
A. There's no way of answering that question without knowing the specifics.
MR. TEHRANIAN: Objection. Asked and answered.
BY MR. LANNEN:
Q. I just gave you the specifics. I'm asking you if you -- if you were to sell the exact license in Exhibit 4 today, what would the cost be?
A. That's not all the factors. That's not answerable.
Q. What factors else would you need to know?
A. The value to the client. Who is the client? What are they --
Q. Did you --
A. What are they doing with the pictures? What is their purpose in licensing the pictures?
Q. This is circular. You're just avoiding the question. The question is, what is the market value for use of these eight pictures on a website for the property?
MR. TEHRANIAN: Objection. Asked and answered. The question isn't specifying who the use

is by, how long the use is for. It's giving none of the specifics.

BY MR. LANNEN:

Q. You can answer the question.

MR. TEHRANIAN: Which is why the client is answering there's -- it's an unanswerable question.

But, Mr. Hargis, you can answer.

A. I do find it to be an unanswerable question.

BY MR. LANNEN:

Q. Okay.

A. It would be more because five years have intervened. I charge more than I charged then. There are so many factors that go into it.

Q. Which factors are those? Name them each.

A. I don't think I have a comprehensive list. And, again, this is not a formulaic thing.

Q. This is your testimony. You said it takes factors. What are the factors?

A. I don't have a comprehensive list of factors because there's more art than science to this. But the nature of the client, the uses they intend to make of it, my per -- my -- their -- what am I trying to say? The value of the photos to them, whether it's as they communicate it to me or what I think the value to them is. That's going to drive the price higher or lower.

Can you name one conversation about that?
A. No.
Q. That's what I thought. Same questions for Exhibit Number 6. Can you give a market value for the license described as you granted it to Atria in Exhibit Number 6?
A. I find the phrasing of your question unanswerable.
Q. And had American House Management requested a license as described in Exhibit 6 from you in December 2020, what would the cost have been?
A. Don't know.
Q. And what data do you not have that you think you need to answer what the value of the license for each of Exhibits 4, 5, and 6 would be?
A. I would need to know the extent of the usage and I would need to have a sense of the value of the photography to that client.
Q. I'm saying for the exact same usage that was understood when you granted those licenses.
A. But it's not the exact same client. The situation is not the exact same and there are no two exact same situations.
Q. Even though it's for the same facility?
A. Yes.
Q. Even though for -- it's for a senior care living

A. No.
Q. Okay. My question is, do you have any reason to dispute that the images in question in November of 2021 were stored in an electronic folder labeled "do not use"?
A. No.
MR. TEHRANIAN: Objection. Lack of foundation. Calls for speculation.
Scott, you can answer.
A. My answer is no.
BY MR. LANNEN:
Q. Do you have any reason to dispute that from and after April through the end of 2021 the images in question were stored in an electronic folder titled "do not use"?
MR. TEHRANIAN: Objection. Lack of foundation. Calls for speculation.
A. No.
BY MR. LANNEN:
Q. Isn't it true that you were paid $13,100 in total for the 22 photos at issue in this case?
A. I'll assume that your arithmetic is correct and say yes.
Q. Have you licensed any of those 22 photos to anyone else?

A. No, I have not.
Q. Why not?
A. No one has asked me for them.
Q. How many days were the photos in question on the American House Management website without your authority?
MR. TEHRANIAN: Objection. Calls for speculation and facts that are in American House's possession and not Mr. Hargis's.
Scott, you can answer the question.
A. I don't know.
BY MR. LANNEN:
Q. Isn't it true that your claim in this case is that American House Management used the 22 photos without your authority?
A. Yes.
Q. Did you demand $3.3 million in this case?
A. I'm not sure what the demand was initially.
Q. Do your damages include attorneys' fees to date?
A. I do not believe they do.
Q. Why haven't you sued Atria?
MR. TEHRANIAN: Objection to the extent it calls for attorney-client privileged communications.
BY MR. LANNEN:
Q. Well, that's true. I'm not asking for that. I don't

You can answer outside of that, Scott.
A. I have not considered it.
BY MR. LANNEN:
Q. And, again, other than discussions with your lawyer, is there a reason you haven't considered it?
A. Not being aware of their existence would be the first reason I can think of.
Q. What are your actual damages in this case?
MR. TEHRANIAN: Objection. Calls for a legal conclusion.
Scott, you can answer if you understand.
A. I'm not sure the extent of my actual damages.
BY MR. LANNEN:
Q. In a non-legal definition, meaning just your personal Scott Hargis's opinion, what do you personally believe your damages to be?
MR. TEHRANIAN: Objection. Asked and answered several times earlier.
A. My personal opinion is that I'm not really in a position to know. This is why I hire attorneys. This is why I have an agency. Because I don't have expertise in damages.
BY MR. LANNEN:
Q. Are you refusing to give anything more specific than that?

A. I don't have anything more specific than that.
Q. What -- what profits were realized based on the alleged infringement by American House Management?
A. I did not realize --
MR. TEHRANIAN: Objection. Asked and answered. Hang on. Hang on, Scott. Let me get my objection in. Asked and answered already.
But, Scott, you can answer.
A. Well, maybe I misunderstood the question. I did not realize any profits as a result of American House's infringement.
BY MR. LANNEN:
Q. My question is what profits were realized by anyone other than you as a result of the alleged infringement?
MR. TEHRANIAN: Same objection. Asked and answered.
Scott, you can answer.
A. I think my answer was that I'm not an employee of American House and just unable to provide that information.
BY MR. LANNEN:
Q. Who are Atria's competitors?
MR. TEHRANIAN: Objection. Calls for speculation.